## APPEAL OF HUTCHINS LUMBER & STORAGE CO.

Docket No. 3307.   Decided August 3, 1926.

1. Amount of paid-in surplus to which the petitioner is entitled, determined.

2. Two hundred and fifty shares of its stock were donated to the petitioner and thereafter sold for $30,000.  *Held*, that said amount may be included in invested capital.

3. Petitioner purchased $25,000 par value of its own stock for $60,000 cash, $45,000 of which was borrowed.  *Held*, that invested capital should be reduced to the extent that the total amount paid exceeds the current earnings available at the date of purchase.

4. Reduction by Commissioner of petitioner's invested capital for income and profits taxes for prior years approved.

5. Certain lumber on hand at the close of the taxable years in question was unsalable due to its damaged condition.  *Held*, that the petitioner may reduce its closing inventories for those years by the amount of the cost of said lumber.

*John E. Hughes, Esq.*, for the petitioner.
*Ellis W. Manning, Esq.*, for the Commissioner.

Before MARQUETTE and MORRIS.

This is an appeal from the determination of a deficiency in income and profits taxes for the calendar years 1919 and 1921 in the amount of $9,039.12.   The deficiency results from the disallowance of bad debts, inventory adjustments and reduction of invested capital.

### FINDINGS OF FACT.

For a considerable time prior to 1915, Ralph G. Hutchins, Eugene R. Hutchins and Carleton B. Hutchins had carried on a lumber and storage business at Blue Island, Ill., under the name of Hutchins Lumber & Storage Co.   On April 22, 1915, said business acquired, at a cost of $8,076, a tract of land of approximately 8⅓ acres, located at Blue Island, a suburb of Chicago, along the Dixie Highway and the main line of the Indiana Harbor Belt Railroad.   When acquired, the improvements on the property consisted of a small cottage and a barn.   The company immediately graded the land, filled it in with three to four feet of cinders, put a drainage ditch around the tract, and prior to September 29, 1915, further improved it with a railroad grade switch track, 1,400 feet across the property to the northwest corner thereof, with two leads with 85 pound rails off the main line of the Indiana Harbor Belt Railroad; a tight board fence about

50144°—27——48

eight feet in height, with wiring on the top, around the entire plot of land; one lumber storage building 70 by 118 feet, a mill building plant 30 by 40 feet, one office building 20 by 36 feet, all of the said building being wired for motors and light; a sawdust vault and cyclone 20 by 20 feet and 30 feet in height; and lumber foundations approximately 2,000 by 20 feet. September 29, 1915, this tract with the improvements thereon, together with the " business, goods, wares and merchandise, accounts receivable, and good will," was conveyed to the taxpayer corporation, which was incorporated September 13, 1915, under the laws of Illinois with a capital stock of $50,000, divided into 500 shares of the par value of $100, in exchange for its capital stock, Ralph G. Hutchins receiving 350 shares.

The resolution of the board of directors of the corporation accepting the property above set out in payment of the capital stock of the corporation was as follows:

RESOLVED, that all of the goods, wares, merchandise accounts receivable, cash on hand, good will and real estate of the business now owned by the subscribers to the capital stock of this company may be conveyed and assigned by them to this company in full payment of their subscriptions to the capital stock of said company, all of said property having been acquired by them with the view to transferring and conveying the same to this company as soon as it was authorized to take title thereto, and that the proper officers of this company be, and they are hereby authorized and empowered to issue 500 shares of the capital stock of this company to the subscribers for the aforesaid property so conveyed and sold by them, the indebtedness of said subscribers being hereby assumed by this company.

The assets transferred to the corporation consisted of $9,065 in cash; miscellaneous personal property, consisting of saws and saw-mill machinery, having at that time an actual cash value of $1,259.24; 648,000 feet of vertical grain running board stock car slats; 303,648 feet of sills, and 200,000 feet of other lumber, the total cash value of all said lumber being $46,491.68; and the land and improvements above described, which, at the time paid in, had an actual cash value of $36,346. Against the above items so paid in, the corporation took over a liability of $13,500.

The stock book of the corporation shows that the 500 shares of capital stock were all issued on September 29, 1915. On November 17 and December 8, 1915, Ralph G. Hutchins donated to the corporation 50 and 200 shares, respectively, of its capital stock. December 22, 1915, the said 250 shares were sold to the Booth-Kelley Lumber Co. for a consideration of $30,000, of which $10,000 was paid in cash and $20,000 in lumber at the then market price. The cash was received by the corporation in 1915 and the lumber was delivered in lots, the last of which was received by the corporation

in 1916. February 5, 1919, the petitioner agreed to repurchase from the Booth-Kelley Lumber Co. the said 250 shares for $60,000. Of the above amount, $15,000 was paid from funds in the petitioner's treasury, and the remainder, $45,000, out of funds borrowed from the Central Trust Co. of Illinois, which amounts were repaid during 1919 and 1920.

The petitioner's net income for 1919 was found by the Commissioner to be $57,485.51, and its net income for 1920, was found to be $77,079.42. The Commissioner deducted $42,227.10 from petitioner's invested capital for 1919, because of the purchase of its own stock as above stated. The Commissioner used the following formula in ascertaining the current earnings available for the purchase of such stock.

In re: Hutchins Lumber Storage Co., year ended December 31, 1919—

### INVESTED CAPITAL.

| | |
|---|---:|
| Invested capital disclosed by books | $120,647.16 |
| As corrected | 76,117.83 |
| Net reductions as explained below | 44,529.33 |

Additions:

| | | |
|---|---:|---:|
| (a) Excessive depreciation to Dec. 31, 1918 | $9,770.38 | |
| (See Recapitulation of depreciation.) | | |
| Total additions | | 9,770.38 |

Reductions:

| | | |
|---|---:|---:|
| (b) $25,000 par value stock purchased for $60,312.36, Mar. 15, 1919 | 42,733.86 | |
| (c) Dividend Dec. 27, 1919, paid from earnings | | |
| (d) Income tax, 1918 | 9,962.33 | |
| (e) Additional income tax, 1917 | 1,603.52 | |
| Total reductions | | 54,299.71 |
| Net reductions as above | | 44,529.33 |

### EXPLANATION OF ITEMS CHANGED.

| | |
|---|---:|
| (b) $25,000 par value capital stock purchased Mar. 15, 1919, for | $60,312.36 |
| Taxable net earnings for year | 55,805.97 |
| Tentative tax | 21,330.75 |
| Net income available for dividends | 34,475.22 |

Net earnings per day—1/365=$94.4522.

| | |
|---|---:|
| Mar. 15, 1919, $25,000 par value stock purchased for | 60,312.36 |
| Earnings available—73 days | 6,895.04 |
| Amount to be deducted from Dec. 31, 1918, surplus | 53,417.32 |
| $53,417.32—292 days | 42,733.86 |

The Commissioner reduced petitioner's invested capital for the year 1919 by the sum of $9,962.33, representing 1918 income and profits taxes of $23,573.76 prorated from the dates the four instal-

ments thereof became due and payable, and by the further sum of $1,603.52, representing additional income and excess-profits taxes for the year 1917, which were paid by the petitioner on January 8, 1920. The Commissioner also reduced petitioner's invested capital for the year 1921 by the sum of $12,775.21, representing 1920 income and profits taxes prorated from the dates the four instalments thereof became due and payable, by the further sum of $1,603.52, additional income and profits taxes for 1917, paid on January 8, 1920, and by the further sums of $10,543.41 and $2,120.52, additional income and profits taxes for the years 1918 and 1919, respectively.

In computing its net income for the year 1917, petitioner used an inventory as of the close of that year which was $5,126.94 less than the value of the inventory shown in its books of account. The Commissioner recomputed the net income for the year 1917 on the basis of the higher book value, showing an increase in the net income for that year, over that shown by the petitioner in its return, of $5,126.94. In computing its net income for the year 1918, the petitioner used an opening inventory in the same amount as that shown as the closing inventory in its return for the preceding year. The Commissioner recomputed the net income for 1918 on the basis of the higher book inventory, showing a decrease in the net income for that year, under that shown by the petitioner in its return, of $5,126.94. In computing the petitioner's invested capital for the year 1919, the Commissioner reduced the earned surplus as of the beginning of the year by the amount of the decrease in the 1918 net income resulting from his adjustment of the opening inventory, but gave no recognition to the increase in the 1917 income resulting from his adjustment of the closing inventory of that year.

In December, 1919, officers of the petitioner made a survey and examination of the lumber in its yard and ascertained that a certain amount was unsalable because it was cracked, imperfect, warped, dry rotted, and otherwise damaged. It charged off for the year 1919 the cost of that lumber, which was $15,315.86. In December, 1921, the officers likewise made an examination of the lumber in the yard and charged off the cost of lumber which was unsalable because of its imperfect and damaged state. The cost of the lumber so charged off for the year 1921 was $11,226.53.

For the year 1921 the Commissioner disallowed a deduction of $6,916.42 for alleged bad debts. Included in this deduction was the sum of $4,854.70 charged off on petitioner's books as a bad debt from an account with the United States Lumber & Box Co., located at Portland, Oreg. This $4,854.70 was an amount paid by petitioner for freight on lumber shipped by the United States Lumber & Box Co. and stored in the petitioner's yard. Claim was made against the United States Lumber & Box Co. for the amount of

the freight so paid, and the claim was finally paid during the year 1924. The balance of the so-called bad debt, amounting to $2,061.72, was charged off in 1921 and has never been collected and can not be collected by it.

## OPINION.

MORRIS: The questions presented for determination in this appeal are: (1) The amount of paid-in surplus to which the petitioner is entitled; (2) whether the sale price of $30,000 for 250 shares of stock donated to the corporation by one of the stockholders and thereafter sold should be included in invested capital; (3) whether invested capital should be reduced for 1919 by $42,227.10 upon the purchase of its own stock with borrowed money; (4) whether there should be a reduction in invested capital for the years 1919 and 1921 of additional taxes for prior years; (5) whether the Commissioner erred in reducing petitioner's invested capital for 1919, by the amount of $5,126.94, on account of an adjustment in the opening inventory for 1918; (6) whether petitioner was entitled to deduct the cost of unsalable lumber in its inventory in 1919 and 1921; (7) whether the Commissioner erred in disallowing in 1921 the sum of $6,916.42, deducted as bad debts; and (8) whether petitioner is entitled to special relief under section 327 (c) of the Revenue Act of 1918.

On the first point it is clear from the evidence submitted that the invested capital, including paid-in surplus, is greater than the amount allowed by the Commissioner. Under the circumstances, we do not consider the sale to the Booth-Kelley Lumber Co. of one-half the capital stock for $30,000 as determinative of the value of the assets. That company was a considerably larger concern whose business extended over a wide area. Its assistance and influence and removal as a competitor were thought to be extremely valuable in the further development of the petitioner's business. Testimony concerning what was paid in to the corporation is not conflicting. There can be no doubt about the $9,065 cash, and the Commissioner has stipulated of record that the miscellaneous personal property other than the lumber at the time paid in had an actual cash value of $1,259.24. The only other items, the value of which the Board is called upon to determine, are the land with its improvements and the lumber. The expert testimony in regard to the value of the land and buildings is that the actual cash value of the real estate at the time paid in to the corporation was $36,346. The price paid for the land in April, 1915, is immaterial. Between April and September, 1915, the character of the property had been completely changed, having been converted from practically vacant land into an industrial plant. There is no evidence in the record of any sales

of a similar character in the vicinity where this land was located, but we are satisfied with the expert testimony as to its actual cash value. As to the value of the lumber paid in to the corporation, the testimony shows the market price of this grade of lumber at the time paid in, and there is no dispute as to the amount thereof. We conclude, therefore, that the actual cash value of the lumber was $46,491.68. This amount plus the actual cash value of the other assets and minus the liability of $13,500, which the corporation assumed, gives the petitioner a paid-in surplus of $29,661.92, as claimed by it.

The second point is whether or not the petitioner may include in its invested capital $30,000 received upon the sale of 250 shares of its stock donated to it by one of its stockholders and thereafter sold. The evidence shows that of the $50,000 capital stock issued in September, 1915, 250 shares thereof were, in November and December, 1915, donated to the corporation by Ralph G. Hutchins and sold to the Booth-Kelley Lumber Co. for a consideration of $30,000, of which $10,000 was paid in cash and $20,000 in lumber at the then market price. This $30,000 was paid in to the corporation for its capital stock and the Commissioner's action in refusing to recognize it as invested capital is in error. It clearly comes within the definition of invested capital contained in section 326 of the Revenue Act of 1918.

The third question is whether the Commissioner erred in reducing petitioner's invested capital for 1919 by the amount of $42,227.10, or any other amount, on account of the purchase by it of $25,000 par value of its own stock for $60,000 cash. The amount of the reduction which the Commissioner has made was arrived at by the use of the formula set out in the findings of fact. The petitioner contends that this stock was purchased entirely out of current earnings and borrowed funds which were repaid out of current earnings and, since no money hitherto included in invested capital was taken therefrom by this purchase, there should be no reduction in invested capital. To merely state the petitioner's contentions is to disclose their fallacy. It lies in the fact that the petitioner is attempting to fix the character of the transaction according to the source from which the funds were derived. It is an attempt to earmark dollars. We think it immaterial whether the funds which were used in the purchase of this stock were borrowed or taken from funds already in the petitioner's treasury. The important facts upon which we must adjudge the character of this transaction are—that the Booth-Kelley Lumber Co. had acquired this stock from the petitioner for the sum of $30,000, which became a part of the petitioner's paid-in capital; that upon the repurchase of this stock the petitioner returned to the Booth-Kelley Lumber Co. the latter's contribution of

$30,000 capital and its share in the petitioner's accumulated surplus. It was a capital transaction involving a return to this particular stockholder of its capital contribution plus its share in the accumulated surplus, and the paid-in capital and surplus, of which these funds were a part, were lessened by the withdrawal of the same. The purchase by a corporation of its own capital stock eliminates the stockholder without substituting another in his place, repays to the withdrawing member his share of the capital, and reduces the amount of the fund contributed to the common venture. See *Appeal of Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803.

In arriving at the amount of the reduction of invested capital the Commissioner has again invoked a theory previously considered and condemned by this Board, that of reducing the net income by a so-called tentative tax for the purpose of determining the earnings available for distribution or retirement of capital stock. Upon authority of our decision in the *Appeal of L. S. Ayers & Co.*, 1 B. T. A. 1135, we must hold that the Commissioner's action in this respect is in error. Subject to this modification of the formula used by the Commissioner, we approve the Commissioner's action in reducing petitioner's invested capital on account of this transaction, to the extent that the total amount paid, to wit, $60,000, exceeds the current earnings available at the date of purchase.

The fourth point is whether the Commissioner erred in reducing the invested capital for each of the years under consideration on account of income and profits taxes as set out in the findings of fact. The several adjustments made by the Commissioner are in conformity with the provisions of the regulations in force in respect of the years under consideration, and are therefore approved. Section 1207 of the Revenue Act of 1926.

The fifth point relates to the reduction of petitioner's earned surplus, for invested capital purposes, at the beginning of the taxable year 1919, by the amount of $5,126.94, on account of an adjustment, in a similar amount, of petitioner's opening inventory for 1918, which adjustment resulted in a reduction of petitioner's net income for the year 1918. The Commissioner increased the petitioner's closing inventory for 1917 by the amount of $5,126.94, which resulted in an increase in the petitioner's net income for that year, over that shown by the books of account, of a similar amount. To be consistent with his action in respect of the year 1917, the Commissioner increased the opening inventory for the year 1918 by the amount of $5,126.94, which resulted in a decrease in the petitioner's net income for that year, under that shown by the books of account, of a similar amount. The increase in the 1917 net income was offset by the decrease in like amount of the 1918 net income, and petitioner's earned surplus is not affected by these adjustments.

The sixth point is whether or not the petitioner is entitled to deduct the cost of certain lumber from its closing inventory for 1919 and 1921. The Commissioner in his answer admits that any goods in an inventory which are unsalable at normal prices or unsalable in the normal way because of damage, imperfections, etc., should be valued at *bona fide* selling prices, less cost of selling. The only evidence in the record in regard to this deduction was the evidence submitted by the petitioner to the effect that, during the years in question, when lumber was loaded out of its yard during the process of unstacking a pile, rotten and damaged pieces would be discovered which the customer would not accept and which were unsalable because of their condition, and that in such cases the cost of the lumber was charged off. From the evidence submitted we are of the opinion that the petitioner was entitled to deduct from inventory in 1919 the amount of $15,315.86 and in 1921, $11,226.43, the cost of this unsalable lumber.

The seventh point is whether the Commissioner erred in disallowing deductions in 1921 amounting to $6,916.42 as bad debts. Of this amount, $4,854.70 represented a freight bill paid by the petitioner on a shipment of lumber, which was stored in its yard, for the United States Lumber & Box Co., of Portland, Oreg. The evidence was not convincing as to the worthlessness of this debt. On the contrary it appears that the petitioner had some security for its final payment, which was made in 1924. We are therefore of the opinion that it is not an allowable deduction for 1921. The balance of $2,061.72 is properly deductible as bad debts in 1921, as it was charged off and the evidence is clear that it could not have been collected.

The eighth proposition submitted is whether the petitioner is entitled to special assessment under the provisions of section 327 (c) of the Revenue Act of 1918, by virtue of having acquired a mixed aggregate of tangible and intangible property and the Commissioner's alleged inability to satisfactorily determine the value of the intangible property. Both the bill of sale and the resolution accepting the property paid in to the petitioner, at the time of its organization, mention the good will as one of the items paid in. The Commissioner did not include any good will value in petitioner's invested capital. The evidence is not sufficient to convince us that the good will, if any, had a value at the date of its acquisition, which, if properly determined, could be included in invested capital. The petitioner has not proven that it is entitled to assessment under the relief provisions of the Act.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*